**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **BRENDA RUSSELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 09 C 5702** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner** ) | |
| **of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Brenda Russell ("Russell") claims that she is disabled by a combination of impairments, including herniated lumbar discs with chronic low back pain, anemia, weight loss, major depressive disorder, and anxiety. She filed this action seeking review of the final decision of the Commissioner of the Social Security ("Commissioner") denying her application for a period of Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 423, 1381. For the reasons explained herein, the court remands the matter to the Administrative Law Judge for further consideration.

## PROCEDURAL HISTORY

Russell applied for DIB and SSI on April 20, 2006, claiming that she became disabled on October 6, 2005. (R. 169-173, 174-79.)[1] The applications contain no explanation of the specific disabilities alleged. (*Id*.) The Social Security Administration initially denied the applications on September 12, 2006, and again, upon reconsideration, on December 12, 2006. (R. 115-18, 125-27, 128-30.) Russell appealed the decision, and her claim proceeded to a hearing on October 8,

---

[1] The ALJ opinion and Russell's brief both cite January 26, 2006, as the date Russell filed for DIB and SSI, but there are no applications in the record bearing this date. (R. 9; Pl.'s Mem. in Supp. of Her Mot. for Summ. J. at 1.) Instead, the record includes an "Application for Disability Benefits" and an "Application for Supplemental Security Income Benefits," both dated April 20, 2006. (R. 169-173, 174-79.) This court adopts the date listed on the applications in the record.

2008.  (R. 23.)  On February 19, 2009, the Administrative Law Judge ("ALJ") issued an opinion denying Russell's claim for benefits.  (R. 9-22.)  The ALJ determined that, while Russell is unable to perform any past relevant work, she is capable of performing unskilled, sedentary work, such as that of an assembler or a sorter, and that there are roughly 7,000 of those jobs within the vicinity of Russell's home.  (R. 20-21.)  Russell appealed the ALJ's decision, but the Appeals Council denied review on July 21, 2009.  (R. 4, 1-3.)  Thus, the ALJ's decision became the Commissioner's final decision.  20 C.F.R. § 404.981.  Russell now seeks review of the Commissioner's decision in this court.

## FACTUAL BACKGROUND

Russell was born on May 19, 1969, and was thirty-nine years old at the time of the hearing before the ALJ.  (R. 29.)  She is married and lives in a mobile home with her husband and three sons.  (R. 30.)  Russell is a high school graduate who has attended roughly eighteen months of college and holds a certificate of her abilities in word processing and secretarial work.  (R. 34.)  She has previously worked in check processing and data entry, and as a receptionist and manager of admissions at a doctor's office.  (R. 36, 104-05.)  Russell has not worked since October 2005.  (R. 35.)

## I.  Medical History

Russell states that her disability began on October 6, 2005 (*see, e.g.*, R. 174), and resulted primarily from three herniated discs in her lower back.  (R. 211.)  From the (often incomprehensible) medical records, the court has prepared the following description of Russell''s medical history of back pain and depression/anxiety disorder.

## A. Back Pain

### 1. Dr. Raj Khurana[2]

Dr. Raj Khurana, an internist at Saint Anthony Hospital, first saw Russell on November 10, 2005. (R. 305.) Russell complained that she was suffering from a "pinched nerve" in her back and assessed her pain at 10 on a scale of 1 to 10. (*Id.*) It is not clear whether Russell was already taking, or whether Dr. Khurana prescribed, "800 mg [i]buprofen" and "Aleve, 6 to 8 a day."[3] (*Id.*) When Russell saw Dr. Khurana again one week later, still rating her pain at 10, Dr. Khurana refilled her Vicodin[4] prescription, and suggested that she get an MRI, as well as an epidural. (R. 302.) (*Id.*) On November 28, 2005, Russell returned to Dr. Khurana, who apparently prescribed oxycodone and Valium; the notes also make reference to Vicodin and Percocet.[5] (R. 301.) Russell visited Dr. Khurana twice in December 2005. (R. 300.) He noted that Russell reported she was falling at home because her legs were "giving out." (*Id.*) The notes also show that he refilled Russell's prescriptions for Percocet and Valium. (*Id.*)

---

[2] Dr. Khurana's notes on his treatment of Russell are among the most illegible in the record, so the following summary may be incomplete or inaccurate.

[3] Russell's doctors alternate usage of the generic and brand names for the medications they prescribe. Any reference to a medication in the court's opinion uses the name used by the doctor in the document cited.

[4] Vicodin is a brand-name painkiller that combines hydrocodone bitartrate, a narcotic painkiller, with acetaminophen to relieve "moderate to moderately severe pain." *PDR Family Guide to Prescription Drugs* 732 (9th ed. 2002). The record does not identify the doctor who first prescribed Vicodin, but according to Dr. Khurana's progress notes, Russell contacted him in November 2005 for back pain, and he directed her to go to the emergency room. (R. 302.) It may be an ER doctor who wrote the original Vicodin prescription.

[5] Oxycodone is the generic term for a narcotic painkiller that is combined with acetaminophen in the brand name drug Percocet, which relieves "moderate to moderately severe pain." *PDR Family Guide to Prescription Drugs* at 511. Valium is the brand name for the generic drug diazepam, used for short-term treatment of anxiety symptoms and as a muscle relaxer. *Id.* at 724.

Plaintiff saw Dr. Khurana several times in 2006, but there was little improvement in her condition. As of January 16, 2006, Russell rated her back pain at 8, and Dr. Khurana again refilled her Valium prescription.[6] (R. 298.) He also prescribed a "transdermal system," presumably the fentanyl patches Russell reports having used.[7] (*Id*.;R. 60-61.) Dr. Khurana noted at that time that Russell "can't sit in place for 15 minutes or more" and that she was "using [a] cane." (R. 298.) Dr. Khurana's notes of a February 9, 2006 visit indicate either that she was receiving, or that he recommended, physical therapy three times per week and that Russell was still taking Percocet. (R. 297.) On March 9, 2006, Dr. Khurana reported that Russell was "feeling better" but was "requesting a stronger medication for pain," and he renewed her fentanyl patch prescription. (R. 296.) Later that month, Russell returned, this time ranking her back pain at 7. (*Id*.) When Dr. Khurana saw Russell again in April 2006 (the record does not reveal the precise date(s) of this visit or visits), he evidently treated her primarily for psychological troubles, described below. (R. 295.)

Russell saw another doctor at Saint Anthony Hospital on July 11, 2006; she saw Dr. Khurana on August 14, 2006 and again on October 19, 2006. On each of these occasions, the doctor approved refilling her prescription for fentanyl patches. (R. 622, 624, 627.) Dr. Khurana approved other prescriptions in October as well, and referred her to Rush University Medical Center for back surgery. (*Id*.) Dr. Khurana's notes of Russell's next appointment, on November 2, 2006, are largely illegible, but he wrote that she was still having trouble sitting straight, that she was using

---

[6]     There is an undated page of progress notes in the record between the notes for December 12, 2005, and January 16, 2006, suggesting that Russell may have had another appointment with Dr. Khurana in the intervening month. (R. 299.) These notes record Russell's anemia, menorrhagia, and difficulty ambulating. (*Id*.) They also appear to indicate that her Percocet prescription was again refilled. (*Id*.)

[7]     The fentanyl transdermal system, also known by its brand name Duragesic, contains a "high concentration" of fentanyl, "a potent opioid analgesic," making it particularly subject to abuse. *Physician's Desk Reference* 1489 (66 ed. 2012). The adhesive patches, which secrete fentanyl for seventy-two hour periods, are used to manage "<u>persistent</u>, moderate to severe chronic pain." *Id*. (emphasis in original).

a cane, and that she had difficulty walking and climbing stairs. (R. 623.)

Things continued in the same way throughout 2007. On January 25, 2007, Russell complained to Dr. Khurana that her back pain was at 10, and Dr. Khurana refilled her prescription for fentanyl patches and recommended over-the-counter Aleve. (R. 620.) Russell saw Dr. Khurana again on March 26, 2007, and complained of body aches, loss of appetite, and headaches. (R. 621.) She saw him again twice in April 2007, and received more pain medication prescriptions. (R. 618, 619.) On June 30, 2007, Russell's pain assessment was a 9, so Dr. Khurana refilled her prescriptions for fentanyl, trazodone, clonazepam, Seroquel, and Cymbalta once more.[8] (R. 616). On September 29, 2007, Russell returned, stating that she had fallen at home, and that her pain was at 10. (R. 617.) Dr. Khurana's progress notes for that date state that Russell had "2 patches of Fentonyl [sic] on" and was "walking [with a] cane." (*Id.*) Dr. Khurana also refilled Russell's prescriptions when he saw her on October 25, 2007, and again on November 29, 2007. (R. 615, 612.)

Russell's visits with Dr. Khurana appear to have been less frequent in 2008. Her visit on February 7, 2008, dealt primarily with her mental health issues, although she still complained of back pain and her inability to sit or stand for too long; it is not clear whether Dr. Khurana refilled any prescriptions at that time. (R. 652.) Three months passed before her next visit on May 29, 2008, where Russell complained of increased pain in her pelvis and lower back, radiating down her legs.

---

[8]     As explained below, Dr. Khurana refilled Russell's anxiety and depression-related prescriptions for the period of time—Russell estimates eight or nine months—between her psychiatric treatment by Dr. Bednarz and that by Dr. Gordon. (R. 53.)
        Russell has taken a variety of prescription medications to treat her mental health issues, including: (1) trazodone, the generic name of an anti-depressant; (2) clonazepam, the generic name for the brand name Klonopin, a benzodiazepine used to treat "unexpected attacks of overwhelming panic accompanied by fear of recurrence"; (3) Seroquel, an antipsychotic, commonly used to combat symptoms of schizophrenia such as "delusions, hallucinations, disrupted thinking, and loss of contact with reality," and; (4) Cymbalta, a serotonin and norepinephrine reuptake inhibitor, prescribed for the treatment of depression, anxiety, and chronic musculoskeletal pain. *PDR Family Guide to Prescription Drugs* at 204, 345, 614; *Physician's Desk Reference* at 1602-03.

(R. 651.)  Dr. Khurana refilled her prescriptions for pain medication and for the fentanyl patches.

(*Id*.)  Finally, on September 8, 2008, Dr. Khurana filled out an "Arthritis/Pain Residual Functional

Capacity Questionnaire," presumably at Russell's request in connection with this claim for benefits.

(R. 688.)  In the questionnaire, Dr. Khurana opined that, in an eight-hour day, Russell could sit for

no more than one hour.  (*Id*.)  Dr. Khurana also stated that Russell could stand and walk for no

more than one hour and that while doing so, she must use a cane or walker "for ability to

walk/tolerate pain."  (*Id*.)  He further noted that Russell could never lift or carry anything, not even

items weighing less than ten pounds.  (*Id*.)  Finally, Dr. Khurana estimated that, if she were

employed, Russell would likely be absent from work more than four days per month.  (*Id*.)

### 2.    Dr. Mitchell Goldflies

In addition to her visits with Dr. Khurana, Russell saw Dr. Mitchell Goldflies, an orthopedic

surgeon to whom Dr. Khurana referred her, beginning in November 2005.  (R. 694.)  As of that first

meeting, Dr. Goldflies noted that Russell "complained of a five-week history of left-sided lumbar

radiculopathy" and that she was currently on a Medrol Dose-Pak and Vicodin.[9]  (*Id*.)  Dr. Goldflies

referred Russell to Dr. George Kuritza for an MRI.  (R. 592.)  The MRI revealed that Russell had

multiple lumbar disc herniations and left-sided lumbar radiculopathy.  (*Id*.; R. 692.)  On November

16, 2005, Dr. Goldflies recommended physical therapy exercises,[10] epidural steroid injections, and

a two-week break from work.  (R. 692.)  At her February 1, 2006 appointment, Russell told Dr.

Goldflies that "she has improved with her epidural steroid injections," but she also requested other

treatment options.  Dr. Goldflies suggested VAX-D treatment, a vertebral decompression treatment

---

[9]    Medrol is a corticosteroid used to reduce inflammation and improve other symptoms related to arthritis.  *PDR Family Guide to Prescription Drugs* at 395.

[10]    At Dr. Goldflies' recommendation, Russell began to see Sanjay Reddy, a physical therapist, on February 2, 2006.  (R. 330.)  She saw Reddy for treatment roughly twenty times during the months of February, March, and April of 2006.  (R. 330-44.)  At the conclusion of the treatment, Reddy reported "no significant improvement" and suggested a re-evaluation visit; no evidence of such a visit appears in the record.  (R. 340.)

intended to relieve lower back pain without surgery.  (R. 690, 282 n. 1.)  His progress notes from this day also state that Russell communicated a desire "to get disability."  (R. 691.)

On April 12, 2006, Dr. Goldflies reported that Russell was feeling better as a result of the VAX-D program, but that she still suffered from decreased lumbar-spine range of motion in all planes and myofascial disorder, i.e., muscle pain.  (R. 698.)  On April 19, 2006, April 26, 2006, and May 3, 2006, Dr. Goldflies noted that Russell reported that the injection therapy helped control her pain, but did not alleviate it entirely.  (R. 704, 706, 701.)  At the April 26, 2006 appointment, Dr. Goldflies wrote a note on his prescription pad saying that Russell could return to work the following day as long as she had breaks as needed for pain.  (R. 720.)  On May 3, 2006, Dr. Goldflies again reported that Russell was "feeling better with the injection therapy," but that she still had "trigger points" which he injected again with local anesthetics, Lidocaine and Toradol.  (R. 701.)  He also gave Russell a prescription for Dolobid to take twice a day.[11]  (*Id.*)

By the time of her appointment with Dr. Goldflies on October 4, 2006, Russell had completed her VAX-D treatment.  (R. 711.)  Dr. Goldflies noted that Russell was feeling better, but that she still had some lower back pain; he again injected these trigger points with lidocaine and Toradol, and offered further evaluation and treatment.  (*Id.*)  His notes from this appointment show that Russell asked "what is the next step" in her treatment.  (R. 712.)  On October 11, 2006, when Russell again complained of neck and back pain, Dr. Goldflies found she had cervical and lumbar paraspinous muscle tenderness, but that she also had good cervical lumbar spine range of motion. (R. 709.)  Again, Dr. Goldflies injected her trigger points with a combination of local anesthetics and prescribed Dolobid.  (*Id.*)  At what appears to be their last appointment, on October 25, 2006, Russell reported that she still had lower back pain, and Dr. Goldflies again injected her trigger

---

[11]     Dolobid is a nonsteroidal anti-inflammatory drug that relieves mild to moderate pain and inflammation, swelling, and stiffness of the joints.  *PDR Family Guide to Prescription Drugs* at 229.

points with local anesthetics.  (R. 707.)  She was offered follow-up evaluation in two weeks, but Russell never returned.  (*Id*.)

### 3. Dr. Curtis Owen

Early on in her treatment, Dr. Goldflies referred Russell to Dr. Curtis Owen ("Dr. Owen"), at Midwest Medicorp, an affiliate chiropractic clinic of Saint Anthony Hospital.[12]  (R. 288-89.)  Dr. Owen saw Russell once, on November 17, 2005.  (*Id*.)  After he evaluated her, Dr. Owen prescribed, and Russell received, "chiropractic manipulative therapy to restore proper vertebral motion and reduce irritation in the vicinity of the injury," "[p]hysiotherapy in the form of interferential current . . . used to reduce muscle spasm and pain," and "[r]ehabilitative exercises . . . given to restore muscular strength and balance."  (R. 289.)  In a narrative report dated June 27, 2006, that was requested by and submitted to a claims adjudicator with the state agency for disability determinations, Dr. Owen declined to comment on Russell's prognosis, noting that he had only evaluated her on that one occasion.  (*Id*.)

### B. Anemia

Russell appears to have had ongoing struggles with iron deficiency and menorrhagia (unusually heavy menstrual bleeding).  There are a number of lab reports from Quest Diagnostics in the record—requested by Dr. Khurana and performed in November 2005 and February 2006—noting Russell's hemoglobin and hematocrit levels, but presenting no written interpretation of this data.  (R. 307-11.)  On November 17, 2005, Dr. Khurana first recommended Russell take ferrous sulfate (iron supplements).  (R. 301.)  He made notes of Russell's anemia and menorrhagia throughout the course of his treatment of her.  (*See, e.g.*, R. 297, 299, 301, 302, 303.)

Russell also saw Dr. Robert Bonaminio regarding anemia and menorrhagia during her May

---

[12]   It is unclear to the court whether Dr. Owen is an orthopedic doctor or a chiropractor.

2006 hospitalization (described below) at Little Company of Mary Hospital for depression and anxiety. (R. 432.) Dr. Bonamino described Russell's anemia as "severe" and gave her a transfusion of red blood cells. (*Id*.) While he reported an "[e]ssentially benign pelvic ultrasound," he did recommend Russell pursue one of several possible procedures to alleviate her blood loss. (R. 432-33.) It appears that Russell followed up and, on June 26, 2006, Dr. Bonamino performed a procedure he described as "dilation and curettage with thermal ablation." (R. 457.)

The physicians who reviewed Russell's records on behalf of the Bureau of Disability Determinations in August 2006, to assist in the initial adjudication of her claim, confirmed her anemia. Dr. Mahesh Shah noted that Russell had a history of anemia, and had reported being hospitalized for blood transfusions. (R. 360.) Dr. Liljedahl, a psychologist for the Bureau of Disability Determination, also reported that Russell said she had received two blood transfusions because of her anemia. (R. 351-52.) Likewise, Dr. Ashok Jilhewar ("Dr. Jilhewar"), the medical expert asked to testify by the ALJ, reviewed Russell's records and concluded that she had a history of anemia. (R. 84-86, 165.)

## C. Psychological Issues

### 1. 2006 Hospitalization

Dr. Khurana's progress notes begin to reflect Russell's worsening psychological condition in the spring of 2006. As of late April 2006, she complained of anxiety, hyperventilation, and difficulty sleeping, and Dr. Khurana prescribed Xanax for these symptoms.[13] (R. 295.) On May 16, 2006, Russell went to the Saint Anthony Hospital emergency room, seeking immediate treatment for anxiety, depression, and thoughts of suicide. (R. 378.) The emergency room records also state that she complained of lower back pain, but that she was ambulating with a steady gait.

---

[13] Xanax, known also by the generic name alprazolam, is a tranquilizer used for short-term treatment of anxiety and panic disorders. *PDR Family Guide to Prescription Drugs* at 752.

(*Id.*)  The staff recorded Russell's statements that she wants to "crawl out of [her] skin," that she "cannot take care of [herself]," and that she "[hasn't] eaten in four days" and "can barely get out of bed."  (R. 380.)  Russell was diagnosed with depression and suicidal ideation.  (R. 381.)  The emergency room medical staff administered Toradol and Valium,[14] and then transferred Russell to the psychiatric ward at Little Company of Mary Hospital,[15] (R. 381), where she remained for several days.

### 2. Dr. Michael Bednarz

Russell remained hospitalized at Little Company of Mary Hospital from May 17, 2006, to May 23, 2006, where she was admitted under the primary care of psychiatrist Dr. Michael Bednarz.[16]  (R. 381, 420.)  Following a psychiatric evaluation on May 17, 2006, another physician, Dr. Harshad Menta, stated that Russell appeared despondent, that her affect was sad, and that she felt hopeless and suicidal, although she had no definite plans of suicide.  (R. 420.)  Dr. Bednarz's notes show that at some point after being admitted to the psychiatric ward, Russell was no longer suicidal but acknowledged increasing depression.  (R. 425.)  Dr. Bednarz noted that Russell may have abused her Xanax prescription.  (R. 423.)  He changed her medication "from Xanax to clonazepam and started [her] on Prozac" and she "gradually improved," but his final diagnosis was major depressive disorder.  (R. 419.)

---

[14]     Toradol is a nonsteroidal anti-inflammatory drug prescribed for "moderately severe, acute pain."  *PDR Family Guide to Prescription Drugs* at 696.

[15]     It is unclear to the court why the transfer was necessary, but it appears insurance coverage was a factor.  The Saint Anthony Hospital emergency record includes only a cryptic notation that Russell could not be admitted there "secondary to her insurance preference." (R. 381.)

[16]     Although the notations from Russell's week-long stay at Little Company of Mary Hospital denote Dr. Bednarz as the treating physician and his name appears on the notes on Russell from the patient database (*see, e.g.*, R. 422-29), Russell testified that she never saw him while she was hospitalized; she saw him four times after she was discharged.  (R. 68.)  The record includes progress notes from their meetings on July 11, 2006, and October 28, 2006, but no documentation from other appointments Russell may have had with Dr. Bednarz.

On a return visit to Saint Anthony Hospital on July 11, 2006, the doctor Russell saw noted the laundry list of medications she was taking, including Paxil, Klonopin, Prozac, Cymbalta, and trazodone.[17]  (R. 627.)  In a "Diagnostic Psychiatric Interview" that Dr. Bednarz completed on that same date, he noted her suicidal ideation, depression, "racing thoughts" and "severe" functional impairment.  (R. 743.)  He noted that Russell's mood was depressed, though he also described her attitude as cooperative, her psychomotor activity and affect as appropriate, and her thought process as goal-oriented.  (R. 744.)  He recommended another change in her medication, this time from Prozac to Cymbalta, and also prescribed Seroquel for her.  (*Id*.)

At their next appointment, on October 28, 2006, Dr. Bednarz's evaluation of Russell's mood, attitude, psychomotor activity, affect, and thought process did not change, but he noted, without further explanation, that she had suffered a partial remission.  (R. 746.)  In a "Mental Impairment Questionnaire (RFC & Listings)" completed at that time, Dr. Bednarz ranked Russell's Global Assessment of Functioning ("GAF") at 40 on a scale of 100, reflecting a decline from her highest GAF score in the preceding year (65).[18]  (R. 492-99.)  Dr. Bednarz listed a number of symptoms of Russell's mental illness, including mood disturbance, suicidal ideation, persistent anxiety, decreased energy, global insomnia, and blunted affect.  (R. 493.)  Although he noted that she was showing some response to her medications and that her prognosis was "fair," he expected the impairment to last at least twelve months.  (R. 494.)  He also anticipated that her symptoms would

---

[17]    Paxil is used to treat panic disorder and "serious, continuing depression that interfere's with [one's] ability to function."  *PDR Family Guide to Prescription Drugs* at 499-500. Prozac is also prescribed to treat ongoing depression that hampers daily function.  *Id*. at 564.

[18]    The GAF Scale is commonly used to assess the psychological, social, and occupational functioning of someone suffering from a mental disorder.  *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000).  A score of 40 denotes "[s]ome impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking or mood."  *Id*. at 34.  A score of 65 indicates [s]ome mild symptoms . . . [or] some difficulty in social, occupational or school functioning . . . but generally functioning pretty well [and] has some meaningful interpersonal relationships."  (*Id*.)

cause her absence from work more than three times a month.  (R. 495.)  Finally, Dr. Bednarz predicted that Russell's impairments would result in a marked restriction on activities of daily living, moderate difficulties in maintaining social functioning, and repeated (as in three or more), but not "continual," episodes of decompensation in work or work-like settings.  (R. 498.)  Russell testified that she stopped seeing Dr. Bednarz because she was "unable to pay . . . what [she] owed him." (R. 52-53.)

### 3.    Dr. Khurana

The record shows, however, that Russell received at least some additional treatment for depression from her internist, particularly in late 2006 and in 2007.  Dr. Khurana refilled Russell's anxiety and depression-related prescriptions for that period of time between her psychiatric treatment by Dr. Bednarz and that by Dr. Gordon (see below).  (R. 53.)   Thus, when Russell saw Dr. Khurana on October 19, 2006, she reported anxiety attacks, and Dr. Khurana wrote additional prescriptions for Seroquel, Cymbalta, trazodone, clonazepam, and for the fentanyl patches.  (R. 622.)  Dr. Khurana's progress notes on January 25, 2007, mention Russell's complaints of "recurrent anxiety attacks."  (R. 620.)  When she complained of increased anxiety and dizziness on June 30, 2007, Dr. Khurana approved refilling her prescriptions for Seroquel, Cymbalta, trazodone, clonazepam, and for the fentanyl patches.  (R. 616.)  It is possible Dr. Khurana provided more treatment regarding Russell's medical and psychiatric difficulties; the majority of his notations are illegible.

### 4.    Dr. Gordon [19]

During the eight or nine months preceding the hearing, Russell received mental health treatment from Dr. Gordon at Saint Anthony Hospital.  Dr. Gordon's notes are almost entirely illegible.  (R. 53, 644-48.)  Their first meeting appears to have taken place on March 7, 2008

---

[19]    The court was unable to find Dr. Gordon's first name in the record.

(R. 648), and it appears that they had five more appointment prior to the administrative hearing. (R. 644–48.) But the substance of those appointments is largely unknown and Dr. Gordon, who had provided the most recent health treatment, did not furnish any comprehensive assessment of Russell's mental health.

## II.    Russell's Testimony

Russell was thirty-nine years old when she testified before the ALJ on October 8, 2008. (R. 29, 23.) She stated that she lives in a mobile home with her husband and her three boys, then aged sixteen, fifteen, and ten. (R. 30.) Russell described limitations in her daily activities: Because of her back injury, she walks with a cane and cannot tie her own shoes. (R. 47-48.) She tries to cook for her family, but is unable to do so routinely. (R. 40, 46.) She does not perform any other household chores because someone (she did not say who) told her that she cannot vacuum, sweep, mop, or do anything that involves lifting more than two pounds. (R. 46.) She does help fold the laundry on occasion, and she reads books and watches TV. (*Id*.) Since her injury, however, she cannot sit in one position long enough to go to dinner or to the movies with her family. (R. 47.) Because of the side effects from the cocktail of medications Russell takes every day, she drives as little as possible. (R. 32.) When she does drive or ride in a car, she has to sit on a pillow because when the car hits a bump, she feels as though "[her] spine is being crushed." (R. 65.)

Russell testified, further, that due to her back problems, she cannot stand for more than twenty-five minutes before losing her balance (she describes it as "tipping") and that she has scars on her face and head from her frequent falls. (R. 37-39.) Although she is covered by her husband's health insurance, Russell testified that she avoids visiting the emergency room when she falls because she cannot afford the additional medical bills. (R. 39, 40.) She also stated that she cannot sit for more than twenty minutes without getting up and moving about, and that when

she does sit, she has to sit on her legs because sitting flat on her backside causes her to feel sharp, stabbing pains.  (R. 38.)

Russell is also limited by mental health concerns.  She testified that her depression and anxiety have compromised her memory (R. 51), and that she experiences sleeplessness that, at times, has caused her to hallucinate.  (R. 64.)  She spontaneously bursts into tears and has anxiety attacks on a weekly basis, causing her to hyperventilate and feel chest pain.  (R. 63.)  Although she initially saw Dr. Bednarz for psychiatric treatment, she stopped when her account became past due. (R. 52-53.)  Then for some time, she did not see a psychiatrist, but obtained from Dr. Khurana prescriptions for the additional medications originally prescribed by Dr. Bednarz.  (R. 53.)  As noted, for the eight or nine months preceding the hearing, Russell had received psychiatric treatment from Dr. Gordon, but his notes are essentially illegible.  (R. 53, 644-48.)  Russell reports that she has "mellowed out a little bit" with the help of her medications.  (R. 63.)

Russell listed a number of medications that she takes: Cymbalta, Seroquel, alprazolam, trazodone, clonazepam, fentanyl patches, and other available over-the-counter medications, including Aleve and ibuprofen.  (R. 33-34.)  In addition, she testified that Dr. Goldflies had been giving her injections of local anesthesia in trigger points on her back, but that she stopped seeing Dr. Goldflies when he told her that the shots "weren't working" and he could do nothing else for her. (R. 17, 18, 40.)  She explained that the shots were initially "kind of" helpful, but they gradually lost their effectiveness.  (R. 43.)  She also said that the VAX-D treatment helped straighten out her back in the short-term but that she "started getting crooked again."  (*Id*.)  Russell stated that Dr. Goldflies told her she needed to consult with a neurosurgeon about back surgery (R. 40), but that he also told her a neurosurgeon would want to fuse her spine, leaving her with roughly ten percent range of motion.  (R. 42-43.)  Russell testified that she postponed consultation with a neurosurgeon because Dr. Goldflies had suggested she wait for the development of a better procedure; later in

the hearing, however, she explained that she has not pursued surgery because of its cost. (R. 40-41, 42, 108.)

Russell also testified that Dr. Khurana and Dr. Goldflies both recommended that she use a cane or a walker to walk, and she does in fact use a cane or walker to get around at home and elsewhere. (R. 48, 40.) She said that Dr. Khurana gave her one cane and that she bought another one. (R. 48.) She testified initially that she had bought the walker for herself, but later stated that Dr. Goldflies gave her a used one in early 2006. (R. 48, 49.)

Finally, Russell testified about her history of obesity. She explained that she underwent gastric bypass surgery in 1995 when she weighed 328 pounds. (R. 61.) Before her back injury, she weighed about 200 pounds, but "within the first four months" after her injury date, she lost roughly 60 pounds. (R. 31.) She testified that Dr. Goldflies once told her that the excess skin she carries around her stomach could be contributing to her back problems and that she has looked into having it surgically removed. (R. 59.)

## III.    Evaluation and Testimony by Outside Physicians

### A.    Dr. Mahesh Shah

On August 15, 2006, Dr. Mahesh Shah conducted a 40-minute internal medicine consultative examination on behalf of the Illinois' Bureau of Disability Determination Services.[20] (R. 359.) Dr. Shah recorded his clinical impressions of Russell, highlighting four problems: (1) "severe low back pain with marked limitation of range of motion"; (2) anxiety and depression; (3) anemia; and (4) history of gastric bypass surgery. (R. 362.) He noted that, although Russell walks with a cane, she is able to "walk 50 feet slowly without the cane" and has "full range of motion . . . in all joints." (R. 361.) Furthermore, although examination of her back revealed "marked tenderness in the lumbar region with mild paraspinal muscle spasms[,] [t]here was no deformity."

---

[20]    Dr. Shah's medical specialty is unclear from the record.

(*Id.*)  Russell's motor strength was "5/5 in both upper and lower extremities."  (R. 362.)  Finally, after a mental health examination, Dr. Shah concluded that Russell was "alert and oriented as to time, place, and person" and that "[h]er memory, appearance, behavior, and ability to relate during the examination were within normal limits."  (R. 362.)  Although he noted that she "looked slightly depressed," he concluded that her overall mental status was "unremarkable."  (*Id.*)

### B.    Dr. Erika Liljedahl

On August 15, 2006, Dr. Erika Liljedahl, a psychologist for the Illinois' Bureau of Disability Determination, completed a 40-minute psychological evaluation of Russell.  (R. 351-53.)  Dr. Liljedahl noted that Russell had "a posture and gait within normal limits" and "no unusual psychomotor agitation/retardation behaviors," that her thinking was "logical and coherent," and that she "did not appear to exaggerate or deliberately feign responses."  (R. 351.)  Dr. Liljedahl also reported that Russell described her daily activities as follows:

> [She] wakes up, she gets her children ready for school (clothes, food), she showers but sometimes she needs assistance to get into and out of the shower (when she feels weaker), cleans up the house ([c]hores include washing dishes, wiping the table or any simple tasks while standing, folding clothes), reads and prepares dinner when the children get home.  Interests include reading and watching TV.  She also draws sometimes.  The claimant reported having one friend but she does not really socialize with others, but her family is her social support network.  Cooking skills include using the stove and microwave and simple meals that take less than a half an hour.  The claimant's husband takes care of all finances and pays the bills.

(R. 351.)  As for Russell's mental status, Dr. Liljedahl stated that Russell was "oriented to person, place, time and reason for appointment."  (R. 352.)  She was able to complete simple tasks testing her memory, recall, arithmetic skills, and current events knowledge, making only a few minor mistakes.  (R. 352-53.)

Based on the results of her examination and on Russell's medical history, Dr. Liljedahl concluded that Russell's mental status is "generally intact" but that she suffers from a depressive disorder.  (R. 353.)  Dr. Liljedahl wrote that Russell suffers from "classic symptoms of depression

including negativisitic brooding, tearfulness, sadness, and feelings of worthlessness." (*Id.*) Still, she described Russell's prognosis as "[f]air." (*Id.*)

### C. Dr. Ashok Jilhewar

Dr. Ashok Jilhewar reviewed Russell's medical records and listened to her testimony on October 8, 2008, before he testified as a medical expert in the case. He stated that none of Russell's medical records indicate any muscle weakness in her legs that corresponds to her herniated disks, so, he concluded, she did not suffer from any motor loss, notwithstanding her use of a cane. (R 73-74, 75, 78.) He was "impressed" by Dr. Shah's determination that Russell's motor strength was "5/5 . . . in all extremities." (R. 84.) Dr. Jilhewar also noted that Russell's anemia does not meet the corresponding listing for presumptive disability because she does not need a blood transfusion every three months. (R. 86.) Nor did he find her recent weight loss or her gastric bypass surgery remarkable or particularly relevant to her SSI claim. (*Id.*) Ultimately, Dr. Jilhewar opined that, with respect to Russell's physical capacity to work, she is limited to sedentary tasks with a sit-stand option at will. (R. 90.) In other words, Dr. Jilhewar believed Russell to have a higher functional capacity than Dr. Khurana, Russell's primary doctor. When asked by Russell's attorney what objective evidence is lacking in the record that prevents him from concurring in Dr. Khurana's assessment, Dr. Jilhewar suggested Dr. Khurana's failure to prescribe Vicodin or Provigil cast doubt on his assessment: "For example . . . if there is significant fatigue with the fentanyl or clonazepam, I'm looking for a prescription for Vicodin or Provigil mentioned by the doctor that the fatigue is so severe he has to prescribe these medications . . . ." (R. 96.)[21] Dr. Jilhewar also noted the absence of any verifiable motor loss. (R. 97.)

---

[21] The court does not understand the thrust of this comment, as the PDR suggests that Provigil and Vicodin serve adverse purposes: Provigil is a stimulant used to combat narcolepsy. *PDR Family Guide to Prescription Drugs* at 562. Vicodin is a painkiller that often causes drowsiness and sedation. *Id*. at 732-33.

## IV.    Testimony of the Vocational Expert

Thomas Dunlevy, a vocational expert ("VE"), testified at the October 8, 2008 hearing about Russell's ability to perform work existing in the national economy.  (R. 101.)  At the start of his testimony, the ALJ asked the VE if he was "familiar with [the] information about jobs that's in the *Dictionary of Occupational Titles*," to which the VE responded,"Yes."  (R. 102.)  Next, the ALJ asked, "[I]f your testimony differs in any way with information in the *Dictionary of Occupational Titles*, will you let me know?"  (*Id*.)  The VE again responded, "Yes."  (*Id*.)

The ALJ asked the VE whether any jobs exist for an individual of Russell's age, education, and work abilities who could only engage in sedentary work with (1) no climbing of ropes or ladders; (2) no work around heights, machinery, or hazards; (3) no crouching or crawling or kneeling; (4) only occasional stooping; (5) only brief and superficial contact with the public and co-workers; (6) only simple, routine, and repetitive tasks; and (7) a sit-stand option at will.  (R. 106.)  The VE testified that, in the Chicago metropolitan area, two classes of jobs fit this description: (1) assemblers, of which a minimum of 4,000 jobs exist, and (2) sorters, of which a minimum of 3,000 jobs exist.  (*Id*.)  He added that a need to use a cane would not affect a person's ability to perform these jobs.  (R. 107.)

Russell's attorney asked the VE whether an individual taking Russell's combination of medications could retain any such job if she would be "off-task or unproductive" for twenty percent of the day.  (R. 107.) The VE acknowledged that such a limitation, were it a "sustained and regular problem," would likely preclude Russell from meeting the reasonable expectations of most employers.  (R. 107-08.)

## V.    The Administrative Law Judge's Findings

On February 19, 2009, the ALJ issued her opinion finding Russell ineligible for DIB and SSI benefits.  The ALJ found that Russell met the insured status requirement and that she had not

engaged in substantial gainful activity since her injury onset date of October 6, 2005. (R. 11.) The ALJ determined, further, that Russell has the following severe impairments: (1) herniated lumbar discs with chronic low back pain; (2) anemia; (3) weight loss of undetermined etiology; (4) major depressive disorder; and (5) anxiety. (*Id*.) Still, the ALJ concluded that Russell did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, which would have resulted in a presumptive disability finding. (R. 12.) Specifically, the ALJ found listing 1.04 for disorders of the spine inapplicable to Russell because

> . . . there is only one positive straight leg raising test early in the time period under consideration and prior to an epidural injection and negative results on later exams and no evidence of motor loss (atrophy and/or weakness) or sensory/reflex consistent with documented levels of herniation . . . . Even if there were more positive straight leg raising tests (which is a subjective test), the medical expert's testimony was that the absence of clinical findings of motor loss (which are objective tests) would outweigh this fact.

(*Id*.) Nor did the medical expert, Dr. Jilhewar, think the use of a cane alone constituted a clinical finding of motor loss particularly when, as the ALJ noted, "there is no evidence [the cane] was recommended or prescribed by a physician[ ]." (*Id*.) The ALJ also found inapplicable listing 5.08 (weight loss due to a digestive disorder impervious to treatment); although Russell had lost weight, her body mass index at the time remained better than what is required by the listing for a finding of disability. (*Id*.) Likewise, listing 7.02 (chronic anemia) was inappropriate because Russell's blood transfusions were too infrequent. (*Id*. at 12-13.)

Finally, the ALJ determined that Russell met neither listing 12.04 (affective disorders) nor listing 12.06 (anxiety-related disorders), because Russell suffered only moderate, not marked, restrictions to her daily activities, social functioning, and ability to concentrate. (R. 13-15.) The ALJ found a greater degree of limitation to Russell's daily activities than the state agency reviewer had found, but the ALJ also did not find marked limitations, in part because Russell reported a greater capacity for daily activities in a 2006 psychological evaluation than she did at the October 8, 2008

hearing. (R. 13.) With respect to Russell's social functioning, the ALJ also found no marked restrictions because no physician had reported difficulties interacting with her or getting her to cooperate in exams. (R. 14.) While the ALJ did give "some credence" to Russell's testimony about the side effects of her medications on her concentration, she noted that Russell performed well during Dr. Liljedahl's evaluation and concluded that any restrictions on her concentration were only moderate. (*Id*.) The ALJ acknowledged that Russell suffered a period of decompensation in May 2006 when suicidal thoughts prompted her hospitalization, but found the evidence insufficient to support a finding that repeated episodes of decompensation were likely. (R. 15.) Therefore, Russell did not meet the requirements for the mental health listings related to her depression and anxiety.

Next, the ALJ found that Russell had the residual functional capacity ("RFC") to perform less than the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). (R. 15.) In other words, Russell can stoop and balance, lift up to ten pounds with occasional lifting of lighter objects, stand or walk for two hours, occasionally climb stairs or ramps, and sit for at least six hours with the option to sit or stand at will; she cannot, however, crouch, crawl, kneel, climb ropes or ladders, or work around heights or hazards. (*Id*.) The ALJ concluded that "[s]he is able to perform simple, routine and repetitive tasks which do not require more than brief and superficial contact with the public and coworkers." (*Id*.)

In formulating her RFC determination, the ALJ considered Russell's testimony regarding her symptoms and the extent to which those symptoms could be corroborated by objective evidence in the record. (R. 15.) Although the ALJ found Russell's "medically determinable impairments could reasonably be expected to cause the type of symptoms alleged," she did not believe Russell's "statements concerning the intensity and persistence and limiting effects of these symptoms to be fully credible." (R. 16.) In assessing Russell's credibility, the ALJ noted several inconsistencies in her testimony: The ALJ noted that although Russell seemed to be improving

20

with treatment from Dr. Goldflies, she nevertheless stopped seeing him for no apparent reason. (R. 17.) Russell asserted that Dr. Goldflies had told her his treatment could not further eradicate her back pain and that she should consult a neurosurgeon about surgery, but, the ALJ observed, that statement is not memorialized anywhere in Dr. Goldflies' notes. (R. 17, 18.) Moreover, the ALJ noted that Russell stated she postponed consultation with a neurosurgeon at Dr. Goldflies' suggestion, but then later acknowledged that she never consulted a neurosurgeon because of the cost. (R. 18-19.)

Russell's testimony regarding her use of a cane and a walker and the medical reports were also inconsistent, in the ALJ's view. (R. 18.) For example, Russell first said she purchased the walker, but then later testified that Dr. Goldflies gave it to her. (*Id*.) The ALJ also found it "highly unusual" that Dr. Khurana and Dr. Goldflies would recommend that Russell use an assistive apparatus like a cane, yet not record such a recommendation in their case notes. (*Id*.) The ALJ further cited various instances in the record where Russell ambulated without a cane and the absence of any evidence of muscle weakness in her treatment records. (*Id*.)

The ALJ gave little weight to Russell's statements about her diminished capacity for daily activities because such statements are difficult to corroborate. (R. 18.) Moreover, the ALJ noted, Russell's recent statements concerning her daily activities conflicted with those she gave in a 2006 psychological evaluation. (*Id*.) Russell had looked for work since the onset of her injury, which suggested to the ALJ that Russell herself "believes she is capable of working." (*Id*.) The fact that there was no indication of "significant use of medications for breakthrough pain," suggested to the ALJ that Russell's current prescriptions adequately control her pain. (R. 18.) And the ALJ found no objective evidence of the nature or severity of the symptoms Russell claims result from her mental health issues. (R. 16.)

In addition to Russell's testimony, the ALJ also considered the various medical opinions in the record when making her RFC assessment. The ALJ opted to give the greatest weight to the

medical expert's opinion, which she found most consistent with the record. (R. 19.) She gave less weight to the opinion of Dr. Khurana, Russell's primary care physician, because he

> . . . provided his opinion in single-page form, with no explanation, and with no citation to medical findings. Even though he is a treating source, and taking into account the nature and extent of his treatment, the lack of explanation leaves me unable to discern the basis for his decision. Given that Dr. Khurana's notes consistently document the claimant's reported pain levels, it seems more likely than not that his opinion is based largely on claimant's subjective report of pain.

(*Id*.) By contrast, observed the ALJ, the medical expert, Dr. Jilhewar, "gave a very detailed explanation of the evidence he used as the basis for his opinion, including the diagnostic evidence regarding herniated disks and the lack of abnormal neurological findings." (*Id*.) The ALJ concluded that Russell has "a greater level of capacity" than Dr. Khurana's opinion suggests. (*Id*.)

Based on her RFC determination, the ALJ found Russell unable to perform any past relevant work, but capable of performing other jobs that exist in significant numbers in the national economy. (R. 20.) Citing the vocational expert's testimony, the ALJ concluded that, while Russell's condition would prevent her from performing the full range of unskilled sedentary work, she is able to perform the functional requirements of occupations such as an assembler or sorter.[22] (R. 21.) The ALJ added that the vocational expert's testimony was consistent with the *Dictionary of Occupational Titles*. (*Id*.)

---

[22] The ALJ initially states that the vocational expert testified that Russell would be able to perform the functions of "an assembler, inspector, or hand packer," before she continues on to discuss the two job "clusters" of assembler and sorter. (R. 21.) The vocational expert, however, never specifically cited the occupations of inspector or hand packer at the hearing; he listed only the positions of assembler and sorter. (R. 106-07.)

## DISCUSSION

I. **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. 42 U.S.C. § 405(g). In reviewing this decision, a district court may not engage in its own analysis of whether Russell is severely impaired under the SSA regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Likewise, the court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Rather, the court's role is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Young*, 362 F.3d at 1001 (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (citing *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

Although the "substantial evidence" standard is deferential, it is not entirely without teeth, and the court "must do more than merely rubber stamp the [ALJ's] decision[ ]." *Scott v. Barnhart*, 297 F.3d. 589, 593 (7th Cir. 2002) (alteration in original) (citation omitted). While the ALJ need not address every piece of evidence, the ALJ must build an "accurate and logical bridge" from the evidence to her conclusion. *Craft*, 539 F.3d at 673 (quoting *Young*, 362 F.3d at 1002). "[A]n ALJ may not 'select and discuss only that evidence that favors his [or her] ultimate conclusion.'" *Bauer v. Astrue*, 730 F. Supp. 2d 884, 892 (N.D. Ill. 2010) (quoting *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994)).

II. **Analysis**

The SSA regulations prescribe a five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or

equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him or her unable to perform his or her past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920; *Craft*, 539 F.3d at 673-74. If the ALJ finds in the affirmative at either step three or step five, then there is a finding of disability. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At step three, if the impairment meets any of the severe impairments listed in the regulations, the claimant is deemed disabled by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments do not meet any of the listings, the ALJ then assesses the claimant's RFC, which in turn is used to determine whether the claimant can perform his or her past relevant work, at step four, or any other work, at step five. 20 C.F.R. § 404.1520(e). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

Russell asserts five arguments in her appeal from the ALJ's finding of nondisability. Specifically, she argues that the ALJ erred when she (1) improperly discredited her treating physicians' reports and failed to request additional information from them in order to supplement the record; (2) failed to resolve conflicts between the vocational expert's testimony and the *Dictionary of Occupational Titles*; (3) improperly evaluated evidence supporting a finding that Russell's back pain met listing 1.04A; (4) insufficiently considered evidence concerning Russell's back pain and frequent need to lie down; and (5) disregarded portions of the vocational expert's testimony that were favorable to Russell. (Pl.'s Mem. in Supp. of Her Mot. for Summ. J. (hereinafter "Pl.'s Mem."), at 6-7, 9, 11, 12, 14.)

## A.  Evaluation of the Opinions of Russell's Treating Physicians

Russell first contends that the ALJ erred by discounting the opinions of her primary physician, Dr. Khurana, and her psychiatrist, Dr. Bednarz, because they are treating sources whose opinions should be accorded controlling weight.  (Pl.'s Mem. at 6-7.)  A treating source or physician is one that has "an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  A treating physician's opinion is generally given greater weight because that physician is "able to provide a detailed, longitudinal picture of [the claimant's] impairments."  20 C.F.R. § 404.1527(d)(2).  The ALJ should give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record.  *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996).  Once substantial evidence in opposition to the treating source's opinion is introduced, however, the presumption disappears, and the treating physician's evidence is just one more piece of evidence that the ALJ must consider.  *Hofslien*, 439 F.3d at 377.  There is no bright line demarcating when evidence inconsistent with the treating physician's opinion becomes "substantial"; it depends entirely on each case's unique circumstances.  *Id*.  But contradictory evidence by a non-examining physician, by itself, is insufficient to support rejection of the examining physician's opinion.  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Regardless of how much weight the ALJ assigns to any medical opinion, an ALJ must, at least, address the claimant's treating physicians' opinions and explain the weight he or she assigned to those opinions.  *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination of decision for the weight we give your treating source's opinion."); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)).

In this case, there is no doubt that Dr. Khurana qualifies as a treating physician; he regularly treated Russell for almost three years prior to the hearing. The ALJ's main reason for according less weight to Dr. Khurana's opinion than to that of the non-examining medical expert, Dr. Jilhewar, was that Dr. Khurana "provided his opinion in a single-page form, with no explanation, and with no citation to medical finding." (R. 19.) Dr. Khurana's limited opinion left the ALJ "unable to discern the basis for his opinion." (R. 19.) She presumed, based on his frequent references in his notes to pain, that Dr. Khurana's assessment was likely based on Russell's subjective reports of pain. (*Id.*) By contrast, the ALJ characterized Dr. Jilhewar's report as a "very detailed explanation" of Russell's impairment in which he referenced (1) the diagnostic evidence regarding herniated disks; (2) the absence of abnormal neurological findings; (3) the absence of objective motor loss, and (4) the absence of medications prescribed for breakthrough pain. (R. 19, 17-18.) Thus, the ALJ found Dr. Jilhewar's opinion more consistent with the record. (R. 19.)

This court sympathizes with the ALJ's preference for Dr. Jilhewar's more thoughtful presentation. This court nevertheless concludes that, while Dr. Jilhewar's opinion may ultimately carry the day, the ALJ is not free to reach that determination on such a patchy and largely undecipherable record as appears here. An ALJ "has a duty to develop a full and fair record," *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000), which includes "a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett*, 381 F.3d at 670 (citing 20 C.F.R. § 404.1527(c)(3)). "[I]n some instances, additional development required by a case—for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record." SSR 96-2p at *4. Dr. Khurana's assessment of Russell's functional capacity

was, indeed, a meager one-page form lacking the detailed explanation the ALJ desired. That may have been, in part, because the form indicated that it would "be used *in addition to* the relevant medical records" (R. 688) (emphasis in original), but unfortunately, Dr. Khurana's records of his treatment of Russell were largely illegible. In these circumstances, the court concludes the ALJ had a duty to follow up with Dr. Khurana by asking him to more thoroughly explain his conclusions and to supplement his RFC assessment with objective clinical findings, if possible.

The record also contains notes prepared by Dr. Bednarz, with whom Russell met four times in 2006. Whether Dr. Bednarz is fairly characterized as a treating source is not obvious from the record. Even a physician who has treated or evaluated the claimant "only a few times or only after long intervals [may be considered] a treating source if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." 20 C.F.R. § 404.1502. A nontreating source, on the other hand, is "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id*. If Dr. Bednarz is a "nontreating source," the ALJ was not required to assign his opinion controlling weight. *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Instead, the ALJ was permitted to evaluate the weight of his opinion in light of other factors. *See* 20 C.F.R. § 404.1527(d)(2)(i)-(d)(6) (factors include length of treatment relationship, frequency of examination, nature and extent of treatment relationship, whether the opinion is supported by and consistent with the record, etc.).

Dr. Bednarz met with Russell on multiple occasions, but exactly how many times and over what time period is, again, unclear from the record. At the hearing, Russell testified that she never saw Dr. Bednarz during her week-long hospitalization in May 2006, but that she saw Dr. Bednarz on four occasions *after* she was discharged. (R. 68.) Yet in her reply brief before this court, she asserts that Dr. Bednarz examined her at least twice, possibly more, over an eight month period, including *during* her week-long hospitalization. (Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Summ.

J. (hereinafter "Pl.'s Reply"), at 3, n.1.) The medical records themselves are equally confusing. Although Dr. Bednarz is listed as the admitting physician for Russell's week-long hospitalization at Little Company of Mary Hospital in May 2006 (*see, e.g.*, R. 381, 419), there is no indication that he examined Russell or wrote any of her progress notes from that week. He did, however, examine her on July 11, 2006, and October 28, 2006. (R. 743, 746.) But Russell testified that she stopped seeing Dr. Bednarz "after two months" because she couldn't afford him. (R. 52-53.)

Russell also testified that she had been regularly seeing Dr. Gordon for the eight or nine months preceding the hearing (R. 53), and this appears to be corroborated by roughly five pages of Dr. Gordon's progress notes. (R. 644-48.) Yet, although the ALJ recognized that Russell's mental health impairments have resulted in "regular psychiatric visits," she does not appear to have deemed either Dr. Bednarz or Dr. Gordon a treating physician and, in a few sentences, she dismissed their notes and records as not probative of any serious mental impairments suffered by Russell. (R. 17.) In this court's view, any doctor who has been involved in Russell's "regular psychiatric visits" may well be a treating source; the ALJ should identify that source and explain what weight she has accorded the source's opinion and why. Here, too, it would be appropriate for the ALJ to "solicit additional information to flesh out" the clinical conclusions drawn by Drs. Bednarz and Gordon.

### B. Conflicts Between the Vocational Expert's Testimony and the *Dictionary of Occupational Titles*

Russell next argues that the ALJ erred by failing to resolve conflicts between the vocational expert's testimony and the *Dictionary of Occupational Titles* ("*DOT*"). According to S.S.R. 00-4p, the ALJ has an affirmative obligation to determine whether the testimony of a vocational expert about the requirements of a particular job is consistent with the *DOT*. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). In a section entitled "The Responsibility to Ask About Conflicts," S.S.R. 00-4p explains that the ALJ is required to "[a]sk the VE or VS if the evidence he or she *has*

*provided* conflicts with information provided in the *DOT*" and, "[i]f the VE's or VS's evidence appears to conflict with the *DOT*, [to] obtain a reasonable explanation for the apparent conflict." SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000) (emphasis added). Russell argues that, in light of the fact that S.S.R. 00-4p uses the past tense, an ALJ cannot meet her obligation by asking the vocational expert whether information he *will* provide will conflict with the *DOT*. In support of this assertion, she cites *Harris v. Astrue*, No. 2:06-CV-222-PRC, 2008 WL 410577, at *8 (N.D. Ind. Feb. 11, 2008), where the court stated in dicta that the ALJ failed to comply with S.S.R. 00-4p in asking the vocational expert about conflicts with the DOT before he gave his testimony.

Since the parties have submitted their briefs, however, the Seventh Circuit has expressly rejected the notion that Ruling 00-4p imposes a "temporal requirement" on the ALJ's questioning of the VE. *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011). In *Weatherbee*, as in this case, the ALJ asked the vocational expert, in advance of her testimony, to identify and resolve any potential conflicts between her testimony and the *DOT*. *Id*. at 567. The court found no violation of Ruling 00-4p. The court observed that the Ruling does not dictate when the ALJ's inquiry must occur; instead, Ruling 00-4p requires only that the ALJ "inquire about conflicts 'before *relying*' on a [vocational expert's] testimony." *Id*. at 570 (emphasis in original).

At the hearing in Russell's case, similarly, the ALJ's inquiry under Ruling 00-4p preceded the vocational expert's testimony: the ALJ asked him before he offered his opinions to identify and resolve any potential conflicts with the *DOT*, and this court has no reason to believe the vocational expert failed to do so. The ALJ fulfilled her obligation under Ruling 00-4p to inquire about potential conflicts.

That said, Ruling 00-4p requires more than a simple inquiry about potential conflicts between the VE's opinions and the *DOT*. The ALJ is also expected to elicit a reasonable explanation for any such conflicts. *Overman*, 546 F.3d at 463. Russell identifies two discrepancies that she claims the ALJ failed to address. First, she argues that the vocational expert's response

to the ALJ's hypothetical was inconsistent with the *DOT*. (Pl.'s Reply at 4-5.) The ALJ asked whether jobs existed for a person who, *inter alia*, could perform only sedentary work and needed a stand/sit option at will. The VE testified that such jobs do exist, and mentioned assembling and sorting jobs specifically. (R. 106.) Yet as Russell observes, the *DOT* describes "sedentary work" as involving "only occasional[]" standing and walking, *Dictionary of Occupational Titles*, 1991 WL 688702 (4th ed. 1991), which is distinguishable from employment that allows the worker to sit or stand at will in order to manage physical discomfort.

Second, Russell draws the court's attention to an inconsistency between the vocational expert's testimony and a Social Security ruling. Inconsistencies between vocational expert testimony and Social Security rulings are not explicitly addressed by S.S.R. 00-4p, but the court agrees with Russell that an ALJ's finding of nondisability ought not contravene a Social Security ruling. Specifically, S.S.R. 83-12 states that in the "special situation[]" where a claimant "may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting," that claimant "is not functionally capable of doing . . . the prolonged sitting contemplated in the definition of sedentary work." SSR 83-12, 1983 WL 31253, at *4 (1983). In other words, a fair reading of S.S.R. 83-12 is that a claimant requiring a sit/stand option at will cannot do sedentary work—a notion that directly conflicts with the ALJ's hypothetical question and the vocational expert's response. The Ruling explains that there are some jobs in the national economy where "a person can sit or stand with a degree of choice," but that they are typically professional and managerial positions. *Id*. Russell has never held a professional or managerial job and does not appear to possess the skills for such employment. The Ruling therefore suggests that there may not be jobs in the national economy consistent with the ALJ's RFC assessment.

The Commissioner argues that the court need not remand on this issue because Russell did not identify any conflicts at the ALJ hearing, nor were any potential conflicts so obvious that the ALJ should have recognized them. *See Overman*, 546 F.3d at 464 ( ALJ's duty to investigate only

30

"apparent" conflicts under S.S.R. 00-4p requires remand only where the claimant identifies, but the ALJ ignores, a conflict at the hearing or where conflicts "were obvious enough that the ALJ should have picked up on them without any assistance"). The Commissioner is correct that Russell did not flag either of these potential conflicts at the hearing, nor is it clear that they were "obvious enough" that the ALJ should have explored them further. As this court has already determined that remand is necessary to further develop the record, however, Russell may well have the opportunity to raise these potential conflicts, and the ALJ may need to consider additional testimony from the vocational expert if it is necessary to do so in order to resolve any apparent conflicts.

**C.      Evaluation of Evidence Allegedly Supporting a Finding that Russell's Back Condition Met Listing 1.04A**

Next, Russell argues that the ALJ failed to properly evaluate evidence supporting a finding of presumptive disability under listing 1.04A based on Russell's chronic back pain. Under listing 1.04A, one way to prove a disorder of the spine is to show (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness); (4) sensory or reflex loss; and (5) positive straight-leg testing in sitting and supine positions if the injury involves the lower back. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Russell argues that the ALJ's analysis of listing 1.04A was "perfunctory" and ignored evidence favorable to Russell.

In support of her assertion, Russell relies on *Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006), a case that involved a truly cursory analysis of the presumptive disability finding. In *Ribaudo*, the ALJ explained in two sentences that no listing was applicable because the non-examining Social Security Administration experts who reviewed the record said so. 458 F.3d at 583. Here, by contrast, the ALJ engaged in a thorough analysis of five individual listings, including listing 1.04A. (R. 12-13.) In regards to listing 1.04A, the ALJ observed that no evidence in the record described the required motor loss or sensory or reflex loss—for example, in Russell's

quadriceps or EHL muscle—consistent with the documented levels of herniation.  (*Id*.)  The ALJ may have understated the evidence supporting Russell's claim, as progress notes from physical therapy treatment do refer to muscle weakness and reflex and sensory loss.  (*See e.g.*, R. 331, 344.)  As the ALJ noted, however, those records pre-date both Russell's VAX-D and epidural treatments, both of which Dr. Goldflies reported as having improved Russell's condition.  Moreover, the ALJ wrote, Dr. Jilhewar, the medical expert, also noted "the absence of clinical findings of motor loss."  (R. 12.)  Dr. Jilhewar testified that he was "impressed" by Dr. Shah's statement that, when he examined Russell on August 15, 2006, her motor strength was "5/5 in both upper and lower extremities."  (R. 84, 362.)  The ALJ also reasonably relied on Dr. Jilhewar's assertion that Russell's use of a cane is not the medical equivalent of a clinical finding of motor loss.  Because the ALJ built "an accurate and logical bridge" from the evidence to her unfavorable finding of presumptive disability, the court will not disturb that finding.

### D.    Evaluation of Evidence Regarding Russell's Back Pain

Russell also argues that the ALJ failed to accord due weight to all the evidence showing Russell's considerable back pain and frequent need to lie down.  The Commissioner responds that the ALJ gave less weight to Russell's subjective statements of pain because the ALJ doubted Russell's credibility.   Reviewing courts "afford a credibility finding 'considerable deference' and overturn it only if 'patently wrong.'"  *Prochaska*, 454 F.3d at 738 (quoting *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)).  Such deference is merited given the ALJ's unique ability to observe and assess the claimant.  *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).  An ALJ is required, however, to articulate specific reasons, supported by evidence in the record, that explain his or her credibility determination.  SSR 96-7p, 1996 WL 374186 (July 2, 1996).  "Only if the trier of fact grounds his [or her] credibility finding in an observation or argument that is unreasonable or unsupported. . . can the finding be reversed."  *Prochaska*, 454 F.3d at 738 (citations omitted).

There is no question that the ALJ engaged in a thorough discussion of the bases for her determination that Russell's statements regarding "the intensity, persistence, and limiting effects" of her pain are not entirely credible. (R. 16.) As described earlier, the ALJ identified specific reasons for her credibility determination, including inconsistencies in Russell's explanations for choosing not to proceed with further treatment with Dr. Goldflies, and for not consulting with a neurosurgeon. (R. 18.) The ALJ mentioned, further, that Dr. Goldflies' notes made no mention of advice Russell claimed he had given her, and that neither Dr. Khurana nor Dr. Goldflies made any mention in their notes of the purported recommendation that Russell use a cane or a walker. (*Id*.) The ALJ cited instances in which records showed Russell ambulated without a cane, noted that treatment records show no corroborating muscle weakness, and pointed out inconsistencies between Russell's testimony concerning her daily activities and the statements she gave in a 2006 psychological evaluation. (*Id*.)

Other aspects of the ALJ's credibility analysis are less convincing, however. For instance, the ALJ suggested that Russell's efforts to find work suggested that "she believes she is capable of working." (R.18.) But the Seventh Circuit has stated that even *having* a job may not be inconsistent with also suffering a disability: "the claimant 'may have a careless or indulgent employer or be working beyond his capacity out of desperation.'" *Barnett*, 381 F.3d at 669 (quoting *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 1998)). The record here presents such desperation; Russell hospitalized herself in May 2006 after contemplating suicide in order to relieve her family of the burden she believed she imposed on them. Her efforts to find employment could well be a product of that desperation. Yet the ALJ assumed otherwise and employed that assumption in discrediting Russell's testimony.

The ALJ also doubted Russell's subjective statements of pain, in part because the record did not reveal "significant use of [additional] medications for breakthrough pain." (R. 18.) It was certainly proper for the ALJ to consider the dosage, effectiveness, and side effects of a claimant's

33

medications, but the absence of a particular medication does not support an inference that the claimant's pain is not disabling. *See Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) (finding an ALJ impermissibly inferred that the claimant's diabetes-related suffering is not serious because she did not take insulin). An ALJ may not draw inferences based on the absence of medication without also evaluating the medical reasons underlying that absence. *See Ribaudo*, 458 F.3d at 585 (rejecting an unfavorable credibility determination where the ALJ addressed the claimant's reliance on over-the-counter medications only and ignored the claimant's explanation for the absence of prescription medications). If the record lacked an explanation the ALJ thought relevant, she should have sought further elaboration from Russell's physicians.

Perhaps the ALJ commented on the absence of "breakthrough" pain medication because Dr. Jilhewar found it notable. Yet Dr. Jilhewar himself recognized that although in "whatever [he] could read" of Dr. Bednarz's notes,[23] there was no mention of breakthrough pain, "that doesn't mean she didn't have it."[24] (R. 88.) Moreover, progress notes from various of Russell's treating physicians include prescriptions for painkillers Vicodin, Percocet, and oxycodone throughout her treatment. (*See, e.g.*, R. 425, 429, 575, 576, 577.) Indeed, Russell testified that she took all these medications—sometimes simultaneously—but neither the ALJ or Dr. Jilhewar appear to consider how those prescriptions might be related to "breakthrough" pain. (R. 61.) As the record currently stands, there is insufficient evidence to support the conclusion that Russell does not suffer breakthrough pain.

---

[23]     Curiously, Dr. Jilhewar focused on the notes made by Dr. Bednarz, a psychiatrist, regarding Russell's pain, rather than notes made by her treating internist (Dr. Khurana) or orthopedist (Dr. Goldflies).

[24]     This was not the only reference made at the hearing to the illegibility of many of Russell's medical records. The ALJ also complained that she was unable to read some of Russell's medical records. (R. 64-65.)

The ALJ's credibility assessment may well be valid; on remand, however, she should revisit that assessment without consideration of the inappropriate factors described above.

### E. Evaluation of the Vocational Expert's Testimony That Allegedly Favors Russell

Finally, Russell argues that the ALJ improperly ignored the vocational expert's testimony regarding a claimant with impaired concentration. This argument has little traction. On cross-examination, Russell's attorney asked the VE whether a person who is "off-task" for twenty percent of each day could retain one of the jobs the VE had suggested would be appropriate for Russell; the VE acknowledged such sustained and regular inattention to work would be unacceptable to employers. (R. 107-08.) Russell asserts that, by failing to discuss this exchange, the ALJ did not address evidence that is favorable to Russell. But the record does not establish that Russell is unable to concentrate twenty percent of the day. To the contrary, the ALJ found Russell suffered only moderate restrictions to her concentration, persistence, or pace, based largely on Dr. Liljedahl's August 15, 2006 examination, in which Dr. Liljedahl concluded that Russell's mental abilities are "generally intact." (R. 14, 353.) The medical expert did testify that Russell's medication *can* cause side effects that limit concentration—and the ALJ gave "some credence" to Russell's testimony that she suffers such side effects—but there was essentially no other objective evidence documenting such severe limitations on Russell's ability to concentrate. (R. 94, 14.) As required, when she asked the VE whether jobs suitable for Russell exist in the local economy, the ALJ did refer to Russell's difficulties in concentration:

> And with respect to mental abilities, the restrictions, let's say no more than brief and superficial contact with the public and co-workers and limited to simple, routine, and repetitive tasks . . . can adjust to changes in the workplace and maintain sufficient concentration and persistence as long as the tasks are simple and routine.

(R. 106.) The ALJ did not err in declining to address the VE's response to counsel's hypothetical question.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [10] is granted, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated:  February 24, 2012

_____
REBECCA R. PALLMEYER
United States District Judge